the judges, on Monday the 20th of January, 1812, pronounced their opinions seriatim.
Judge Coalter.
There is considerable hardship in these cases; and had Carr, in his life time, and at an early day after the transactions complained of, resorted í:o a Court of equity for relief, I am not prepared to say that his case would not have come within the third species of fraud enumerated by Lord Haedwicke, in 2 Vezey, 155,(a) which is recognised by the Lord Chancellor in Heathcote v. Paignon, 2 Bro. Ch. Cases, 175. But contracts, which might, at first, be declared invalid by a Court of Chancery, may afterwards receive strength by acts of confirmation.(b) In this case there have been various acts of this kind.
1st. An unconditional confession of judgment to Mason.(c)
2d. The execution of a delivery bond, which does not appear to have been done in order to gain time to resort *130 to a Court of Chancery, but with intention to pay the debt.
3d. He gave a sum of money to obtain a delay of execution on this bond.
4th. Independent of this, he paid a horse and saddle, iu part discharge of the delivery bond. And,
5th. He c-mfessed judgment in favour of Peyton for his half of the debt, with a release of all equity against him.
These various acts of confirmation, in a case in which, originally, I should have entertained considerable doubts, are too numerous and strong to be surmounted.
The decrees must be reversed.
Judge Brooke.
I am not satisfied that there is any' proof in these cases that Wihiam Carr laboured under a general incapacity to make a contract. That he was improvident, extravagant, and of very feeble understanding s.eems not to be denied. Nor am I of opinion that, at the tinte he executed the bond in question, he was incapable of contracting. I will not now, however, decide that he had no equity, under all the circumstances attending that transaction. I shall only observe that, if he had, he released it, in one of the Cases before the Court, with his eyes open, and upon full deliberation. But what I rely on, as affecting both cases, is, that he, long after the bonds to the appellants, deliberately, and of his own accord, confessed judgments, and made several payments. However improvidently all this might have been done, he does not appear to have been under any pressure, or delusion, proceeding from the other party: and the rule is ‘‘ cujus est dare ejus est disponereP The contract Sought to be set aside was not a contract against law j it was not usurious : and confirmations, in which no fraud has been practised, (except of contracts of the last description,') are never relieved against in a Court of equity. The case of Coles v. Gibbons, 3 P. Wms. 290. decided by Lord Talbott, is supposed to have settled this rule» *131 That case is relied on by Lord Hardwick, in the case of Chesterfield v. Janson, 2 Vezey, sen. 125.(a) in which the doctrine is very ably illust ated by him I am therefore of opinion, that both the decrees must be reversed, 1 the injunctions per ,etuated as to the sums paid, and dis- . , , , : , .soived as to the balances due.
Judge Roane.
, Not being able to discern, with the appellee’s counsel, that William Carr, the intestate of the appellee, was incapable, through the weakness oí his understanding, to bind himself by the original agreement in the proceedings mentioned, or to sanction and confirm the same, if originally objectionable; and not deeming it necessarry to decide whether the original contract was in fact violated, or not, at the time the compromise was entered into between the appellant and the appellee’s intestate ; it being entirely competent for parties to compromise controversies, which appear to them to have a bona fide existence, and thus avoid the trouble and expense of a law-suit; I am of opinion that the various acts of confirmation, and acknowledgment, of the original contract, on the part of the said intestate, amount, in equity, to a waiver of the objections aforesaid, if otherwise existing; and, on this ground, that the decree in the case of Mason should be reversed with costs, and the injunction made perpetual as to the payments made on account of the debt in question, and the bill dismissed as to the residue ; and that the bill be wholly dismissed in the case of Payton.
Judge Fleming.
I have, on this occasion, the mortification of differing from a majority of the Court; for whose opinions, as well individually as collectively, I have the highest respect; but having also an opinion of my own, formed according to the best of my judgment, upon mature deliberation, I feel it a duty I owe, as well to myself, as to the community at large, openly to declare it; and, in my conception, there never came before me *132 a case more proper for the interference of a Court of equity, than the one now under consideration.
There appears, however, nothing amiss in the original contract for the purchase of the timber, in the proceed- • • ings mentioned; but all seems perfectly upright and fair; but the subsequent conduct of the appellants has a corstrary character, and presents, to my view, a very different aspect. When I speak of the appellants, I mention them jointly, not well knowing how to separate or distinguish between them ; for, although Mason appears to have been the principal agent in the business, Peyton seems to have shared and equally divided the'spoil. And here it seems proper to advert to, and consider, the character and disposition of the person with whom they were dealing, and who had contracted with Mason for the above-mentioned timber. Although he was not a perfect idiot, no less than seven witnesses, to wit, Luke Cannon, (who was his guardian when he came of age) Asa Blanchard, Fielding Tolson, John Overall, Samuel Davis, James Hayes, and John Hayes, all, as well from their own personal knowledge of him, as from the current report of the neighbourhood, prove him to have been much addicted to intoxication, timorous, extravagant, and often in want of money, unguarded, in the general habit of making improvident bargains, and easily imposed upon by any person who would take the advantage of him.
John Hayes deposeth ‘ that he was a tenant of Mr. Carr, who made him great offers of discount in his rent; and when the deponent made him payments in money, which he thought due, Carr told him to charge what he thought proper, which he always positively refused, as he would not take the advantage of him; whieh he might have done had he thought proper. And, in answer toan, interrogatory put to him by Mason's counsel, he said, he always thought him easily imposed upon in his bargains; and had frequently felt for him in stores, when he saw him giving extravagant prices for goods.
.With these unhappy traits in his character, the appel *133 iants, living in the same neighbourhood, must have been well acquainted, and were resolved to make their advantage of them. It seems admitted on all sides, that appears from the evidence in the cause (not necessary to be here recapitulated; that Carr had not committed a breach of his contract; it may then be asked what injury he had done the appellants, either in their persons or property, or what cause of action or complaint they had against him ? The answer is plain and obvious, “ none at all." But he was wealthy, or in possession of, or rather entitled to, a large estate, and they must have a part of it: and how was it to be effected ? Why, well knowing his temper and disposition, they were resolved to charge him with a breach of contract, which he never committed, work upon his timidity, threaten him with a suit, and heavy damages, and their object was completed ; which I cannot hut consider as a shameful departure from justice and moral rectitude, and as a very proper subject for the animadversion and correction of a Court of equity ; especially, as there is no legal consideration for executing the bonds in controversy, which were exacted, or rather extorted, from the intestate of the appellee, by working upon the imbecility and timorous state of his mind who had done them no injury.
And here let me notice some of the leading principles laid down in the books of equity. “ An unsconscionable bargain, (as a purchase or security got from an heir in his father’s life time) is now (says Fonblanque)(a) usually avoided in equity; for he would justly forfeit the character of an honest man, who should endeavour to make an advantage of this easy age, and enrich himself at the cost of those who either could not foresee, or do not rightly apprehend the loss. The rule (says he) upon which Courts of equity in these cases proceed is not merely in respect of the age of the heir contracting. Osmond v. Fitzroy, 3 Pr. Williams, 131. In Wiseman v. Beake, Wiseman was near forty years of age, and a proctor of the commons; in the case of Curwin v. Mil *134 ner, the heir was about twenty-seven years of age; but the real object which the rule proposes is to restrain the anticipation of expectancies, which must, from its very nature, furnish to designing men an opportunity to practise upon the inexperience, or passions, of a dissipated man. And this being the object of the rule, its operation js not congnecj to heirs, but extends to all persons, the pressure of whose wants may be considered as obstructing the exercise of that judgment, which might otherwise regulate their dealings. See Smith v. Burrows, 2 Vernon, 346. Proof v. Hines, Forrester, 111. Freeman v. Bishop, 2 Atk. 39. and Brookes v. Gally, 2 Atk. 34." If, then, heirs, though in advanced age, and other persons, the pressure of whose wants is considered as obstructing their judgment in their dealings with artful and designing men are to obtain relief in equity, where they all receive something valuable in lieu of what they contract to pay to such artful and avaricious men ; how much more forcibly does the rule apply in the case before us, where the unfortunate Carr received about SOI. advanced by Mason, at different times for his 600 dollars ? 43l. 6s. of which 50l. 4s. 4d. he repaid in his lifetime ; and by an account, settled between the parties by Benjamin Parke, a commissioner, under an order of Court, in May, 1802, Mason appears indebted to the estate of Carr 3l. 10s. 1½d., after allowing him interest on his advances to that time.
But, supposing, for a moment, that Carr had actually committed a breach of his contract, and that Mason was justly entitled to recompense therefor, his taking the bonds, now the subject of controversy, was clearly usury within the statute; for he confesses and states, in one of his answers, as a meritorious fact, that, when a compromise was entered into, he offered to take 400 dolls, if well secured at a short date, but Carr (who, as already proved, was always in want of money) preferred along credit, which (says. Mason) he named hjmself; and for fourteen or fifteen months forbearance, he took *135 bis bonds for 600, instead of 400 dolls.; three hundred payable to himself and Peyton each : which alone (had all the other transactions been upright and fair) would Slave completely annulled and made void the whole. But it has been observed, that Carr voluntarily confessed judgments on both the bonds : and therefore they were binding on his administrators. To which 1 answer, that that circumstance strongly corroborates the testimony of the seven witnesses who had already given evidence respecting his general character.
And, Avith respect to the case of Peyton, that confession of judgment Aras by a special power of attorney made to the lawyer who prosecuted the suit against him, whom he styles his friend, and Avho dreAv it Avith great professional art and skill, but seems to have overshot the mark, and proves, to my mind, a consciousness that something was rotten at bottom. The poAver concludes Avith these remarkable words, to Avit “ And it is understood, that I have instructed, and do hereby instruct, my said attorney, to. release all errors, and equity, in, by, of, to, and concerning the said judgment, Witness my hand and seal, &c.”
If the bond, on Avhich the suit was instituted, had been given on a good and bona fide consideration, why all that abundant caution in wording the power of attorney ?* To me it is additional evidence, that all was not right and fair. I am truly sorry at being compelled, by the circumstances of this case, to make use of any harsh language towards the appellants ; but, it does appear to me, that the scheme to inveigle and fleece the timid, unwary, and unhappy intestate of the appellee,, was conceived in avarice, nurtured by fraud, and consummated in glaring iniquity : and am therefore of opinion, that the decrees are just, and ought to be affirmed s *136 but, a majority of the Court being of a different opinion, both decrees are to be reversed, the injunctions, as to the payments actually made perpetual, and dismissed as to the remainder j which is to be certified, &c.
In the case of Mason v. Williams, the decree was reversed, with costs; the injunction made perpetual as to 70l. 12s. 7½d., and dissolved as to the residue of the judgment j the bill, so far as it sought further relief, was dismissed, and it was ordered that the appellant pay to the appellee his costs by him expended in prosecuting his suit in the said Court of Chancery.
In that of Peyton v. Carr’s administrators, the decree was also reversed ; the injunction totally dissolved, and the bill of the appellees dismissed with costs.

 See also 1 Atk. 352.

 8 P. Wms. 290.

 See 2 H. & M 575.

 1 Atk. se very fully reported.

 Fonbl. 133, 134.

 Note, by the reporter. Peyton, in his answer alleges that a bill of ¿unct'on, on behalf of Carr, had been prepared, before the power of attorney was executed; which circumstance, perhaps, induced the insertion therein of the words releasing equity ; though no proof of this allegation appears in the record.